**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KATHLEEN GORSKI,

        Plaintiff,                                   Case No. 06-13530

vs.

                                                 DISTRICT JUDGE GEORGE CARAM STEEH

JO ANNE B. BARNHART,               MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

## AMENDED REPORT AND RECOMMENDATION

**I.**     **BACKGROUND**

Kathleen Gorski brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner denying her applications for Disability Insurance Benefits under Titles II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

    **A.**     **Procedural History**

Plaintiff applied for benefits in June 2003, alleging that she has been disabled and unable to work since November 18, 2002, due to injuries sustained in an automobile accident (R. 53-56, 63). The Social Security Administration denied benefits initially on November 10, 2003 (R. 43-46). A de novo hearing was held on August 10, 2005, before Administrative Law Judge (ALJ) Henry Perez, Jr. (R. 671-90). Plaintiff was represented by Marc Litman and VE Christian Barrett testified (R. 277). On January 20, 2006, ALJ Perez found that Plaintiff could "perform work activity at any level of exertion from sedentary to very heavy including doing simple jobs

involving only routine production and stress levels, and having occasional contact with the general public and coworkers" (R. 31). Accordingly, he found that she was not disabled (R. 25-34). On June 7, 2006, the Appeals Council denied review (R. 4-6).

### B. **Background Facts**

#### 1. *Plaintiff's Application & Past Work History*

In her June 27, 2003, Disability Report Plaintiff describes her disability as her "head trauma [], short term memory loss, acute stress syndrome, [and] pain in hip and knee from fractures" (R. 63). Her "lack of concentration, painful headaches, weakness, [and] limited strength" limited her ability to work.

Plaintiff worked as a marketing manager from 1989 until 1999 and as a computer assistant from 1995 until 2000 (R. 64). She was last working as an administrative counselor recruiting students for the University of Detroit Mercy from March 2001 until her accident in November 2002, when she filed her application. *Id.*

#### 2. *Plaintiff's Hearing Testimony*

Plaintiff was forty-six years old at the hearing (R. 278). She graduated from Northern Arizona University with a Bachelor of Science degree and worked at Price Club in membership and then in marketing. From 1989 through 1993, she worked as a marketing manager for Pella Window and Door (R. 279). After that she stayed home with her children and worked part-time at Home Depot. She began as a cashier in 1994, subsequently became a front end supervisor, and then worked as a supervising cashier. She then held a position in the cash office, and eventually worked in the computer room doing data entry until 1998 (R. 280-81).

Plaintiff worked full-time as an admissions counselor visiting local high schools,

2

recruiting students, and advising parents, until her accident in November 18, 2002 (R. 281). She stopped working after the accident (R. 282). She does not recall the accident, but has read that she was traveling on interstate 696 when an SUV hit her from behind and she went across the other lanes of traffic. She was hit by two or three cars and a semi truck. She suffered a lacerated liver, lacerated spleen, fractured pelvis, fractured ribs, laceration of her skull and lacerations on her legs. She stayed at Beaumont hospital for five or six days. She was also treated at Henry Ford Hospital for another six days (R. 283). Plaintiff described her residuals from the accident:

> when I was released and came home, I could not lay flat on a bed because of the pelvic fracture, so I was in a reclining chair for seven weeks. I used a walker . . . and experienced vertigo and was dealing with the fractures and the pain and short-term memory loss and confusion and that kind of thing.

Her condition has improved through physical therapy (R. 283-84). The only slight residual effect is on her left hip, which she has been told will eventually be arthritic (R. 284). After the accident, she could not walk without an assistive device until mid-2003.

She still suffers short-term memory loss, but is battling with insurance to receive cognitive therapy. She has been told that the vertigo and dizziness that she experiences once or twice a year will come and go (R. 285). Her primary problems since the accident have been post-traumatic stress and panic attacks due to driving. These panic attacks associated with driving have improved "through a lot of hard work" (R. 286).

She started driving short distances in the summer of 2003 after she could walk again. Yet, she needed to see a therapist every two weeks and a psychiatrist on a monthly basis, and she also took medications. In the two or three months preceding the hearing, Plaintiff saw improvement regarding her physical reaction to her fears.

She still sees a psychiatrist, Dr. Jolepalem, and takes Celexa, Geodon, and Ambien for

3

anxiety and trouble sleeping at night (R. 287). She also sees a psychologist, Marie Ann Buchanan, to help with her fears and "dealing with how [her] life has been affected by the accident and trying to get back into life." (R. 288).

Plaintiff also had high blood pressure, headaches, and vertigo. Currently, she does not have any problems sitting, standing, walking, or lifting (R. 289). She completed physical therapy in November 2003 (R. 289-90).

She stated that she wanted to try to return to work in May or June of 2005, but the driving involved with recruiting for the university would have caused too much anxiety (R. 288). Her last panic attack was two months prior to the hearing (R. 289).

### 3. *Medical Evidence*

From November 18, 2002 until November 22, 2002, Plaintiff was treated at William Beaumont hospital following a car accident (R. 117). She was initially admitted to ICU for observation (R. 118, 134). She suffered a fractured pelvis and left first rib, as well as lacerations to her spleen, contusion of the liver, and subcutaneous emphysema (R. 118, 120, 125, 126, 134, 140-41, 143). While at Beaumont, she complained of vertigo and neck pain (R. 118). Her dizziness and neck pain improved. She was transported by ambulance to Henry Ford Hospital on November 11, 2002.

A CAT Scan on November 18, 2002, revealed "no signs of acute intracranial pathology." (R. 142). A neurological exam performed at Beaumont revealed a brain concussion, and a labyrinthine concussion (R. 122). A brain MRI was ordered. She suffered "[p]ositive post traumatic amnesia and vertigo with decreased memory after a delay which is consistent with a concussion." (R. 125-26). Speech and physical therapy were recommended (R. 126, 152).

4

Speech and Language Pathology Evaluation on November 21, 2002, revealed "mild high level language deficits" (R. 152).

Limited x-ray study on November 18, 2002, revealed no fractures of the spine. CT Scan of the head on November 19, 2002, was unremarkable (R. 145). On November 19, 2002, Plaintiff underwent an aortic and thoracic archogram, both of which were normal (R. 132-33).

From December 2002 until May 2005, Plaintiff was treated for panic attacks by Oakland Psychiatric Associates, P.C. (R. 203-25, 239-74). From December 2002 to September 2003 Plaintiff treated with a social worker (R. 205-24). In late March 2003 she was reporting less anxiety and fear and an increased ability to cope (R. 216-17). In mid-April 2003 she was extremely anxious over her upcoming court case (R. 215). In May 2003 she was coping again and experiencing less fear, but by June she was tearful due to groin pain and feeling powerless (R. 212-13). In July of 2003 she was feeling hopeless, helpless, exhausted with minimal exertion, and tearful (R. 209-10). In August of 2003 she reported successfully taking her boys to camp, although she was previously quite apprehensive about the trip (R. 207-08). She continued to suffer from panic attacks associated with driving, including two in the two weeks prior to her September 9, 2003, appointment (R. 205).

On April 11, 2003, Plaintiff underwent a forensic neuropsychological testing and evaluation" by John J. Blase, Ph.D., ABPN (R. 151). After the accident, Plaintiff reported headaches once or twice a week, lasting all day (R. 153). Prior to the accident, she had headaches six to eight times a year after her pregnancies. The current headaches are set off by stress. Unlike those prior to her accident, they are not alleviated with medication. She also reported pain in her knee, hip, neck, and lower back. She indicated memory problems, anxiety

and depression. She also stated that her sleep is disturbed, and she feels fatigued and a loss of energy.

Dr. Blase concluded that Plaintiff was "a good candidate for cognitive rehabilitation" and "recommend[ed] further assessment by speech, occupational and cognitive therapists with length and intensity of treatment to be determined." (R. 156). Further, he reported that Plaintiff needed psychological counseling (R. 157). Dr. Blase recommended re-testing in 8 to 12 months, if Plaintiff participated in a rehabilitation program.

On January 17, 2003, Balance Function Testing was normal (R. 178). On January 20, 2003, the only cognitive issue was rapid fatigue with concentration (e.g. reading) (R. 176). She was walking with a cane and her medications were ibuprofen and mircette (birth control pills). The assessment and plan was:

> This patient has no evidence of brainstem dysfunction. I think that her intermittent vestibular dysfunction indicates simply that she has had an intermittent abnormality in one of her semi-circular canals. The last time, she was symptomatic, she clearly had a positional vertigo which resolved of its own accord. At this juncture, I think she needs no further testing and hopefully this was her last episode of vertigo. Even if she has another episode or so, I would expect this disorder to spontaneously resolve.

(R. 177).

On June 6, 2003, Plaintiff saw a rehabilitation consultant, Robert Ancell, Ph.D., L.P.C., C.R.C., N.C.C., C.S.W., C.C.M., who concluded:

> From a vocational rehabilitation standpoint, Ms. Gorski has sustained very significant vocationally limiting problems. She is totally unable to do her past relevant work, as it relates to the job at the University of Detroit Mercy. She continues to have ongoing cognitive problems, which were substantiated by Dr. Blase and needs treatment. It is therefore my professional opinion, based on the totality of all the information that at the present time, she is unemployable.

(R. 238).

Plaintiff attended physical therapy in March and April 2003 (R. 168-70, 172, 174-75). Plaintiff was discharged from physical therapy in June 2003 and had met all or most of her goals (R. 162). Plaintiff returned to Henry Ford Hospital after completing physical therapy in August 2003 (R. 159). She reported better range of motion, but still had "bilateral groin pain after sitting for about 15 to 20-minute period of time." Other than the groin pain, she stated that she could walk pain free. Physical examination showed "normal range of motion of the hip with flexion, extension, internal and external rotation, and abduction." She also had a normal gait upon examination and x-rays showed her pelvic fractures were well-healed. Craig Silverton, D.O. concluded that she was doing well from an orthopedic standpoint. He stated that "she can return to normal function as tolerated."

On June 7, 2003, Plaintiff went to the ER and was diagnosed with bronchitis (R. 165-66). In late July 2003, her hypertension was reported as "well controlled." (R. 161). On August 14, 2003, Plaintiff went to a neurology appointment that was mistakenly scheduled as a return visit, but should have been an initial visit (R. 158). She was told she could reschedule for later that day, but she refused.

On October 14, 2003, a Michigan Disability Determination Service licensed psychologist, Margaret Zerba, evaluated Plaintiff (R. 191-96). She complained of panic attacks and memory loss as well as concentration difficulties following the accident (R. 191). She reported seeing her psychiatrist once a month and social worker biweekly. She stated that her social life revolves around her children and she socializes with other "baseball and football moms" once every two months, but "it takes a lot out of [her] to go out." (R. 192). She described a typical day:

7

> I get up with the children, I get them ready for school, then I sleep one-two hours, then run errands, such as grocery shopping, banking, I have a lot of doctors' appointments. I try to make it home by 3 PM to take a nap before the kids get home from school; I help them with their homework - helping them with their homework is helping me use my brain more -, then I take them to football practice, baseball practice, whatever they need, I feel fortunate to be in their lives. My battle cry is you cannot judge someone unless you are exactly in the same circumstances, I feel like a sitting duck in traffic, I need to get strong.

(R. 193). She also reported sleeping difficulties. She "presented as anxious, worried, depressed with panic attacks, and constricted affect." (R. 195). Plaintiff could recall six digits forward, four backward, and two of three objects after five minutes. She accurately calculated serial seven subtractions from 100. Her prognosis was guarded (R. 196).

On November 1, 2003, state agency psychiatrist Stanley Joseph, M.D., reviewed the medical evidence and concluded that Plaintiff's activities of daily living were improving as was her depression (R. 115). Dr. Joseph rated Plaintiff's ability to engage in twenty work-related areas of mental functioning, and found she had moderate limitations in the following: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others (R. 113-14). He found that she was not significantly limited in any other areas. He opined that she was "able to sustain sufficient concentration[,] persistence [and] pace to perform simple[,] repetitive tasks on a regular [and] continuing basis." (R. 115).

8

On July 24, 2004, Plaintiff was evaluated by Albert N. Bayer, M.D. (R. 230-33). He found that:

> Ms. Gorski presents as a 45-year-old white divorced female with symptoms of prominent cognitive impairment, severe intermittent vertigo and headaches, and mood and anxiety symptoms since her involvement in a motor vehicle accident on November 18, 2002. Her presentation is consistent with the diagnosis of Post-Concussive Syndrome, Panic Disorder, Mood Disorder Secondary to a Traumatic Brain Injury, Post-Traumatic Vertigo, and Post-Traumatic Headaches. These conditions can be directly related to the head trauma sustained during the motor vehicle accident on November 18, 2002. These conditions have produced a marked incapacitation in Ms. Gorski's ability to function occupationally and socially.

(R. 232). Dr. Bayer also concluded that "Ms. Gorski's present condition prevents her from functioning occupationally, and this status will continue indefinitely until her condition sufficiently stabilizes. She is currently disabled from work in any capacity. Her prognosis is guarded and is dependent upon her response to treatment" (R. 233).

On October 5, 2004, Dr. Bayer stated that Plaintiff was still under his care and being treated for Post Concussive Syndrome. He stated that her

> condition has resulted in impairment in all spheres of functioning. She is presently attempting to take college courses, but is unable to complete a full-time schedule due to her cognitive deficits. As a consequence of her medical condition she is able to register for a maximum of three courses in a single term.

(R. 229). On October 15, 2004, she had dropped out of school due to anxiety (R. 254).

She treated with psychiatrist N. Jolepalem, M.D., at Oakland Psychiatric Associates, P.C. with treatment notes from July 2003 to May 2005 (R. 239-74). Dr. Jolepalem prescribed Celexa, Ambien, and Geodon (R. 241-46, 248-7, 259-60, 263, 270). During that time she complained of anxiety, memory problems, inability to concentrate, and irritability (R. 241-42, 244-46, 248-51, 253-58, 261-63, 265-67, 269, 271-74). In January 2004, she had a "decrease in panic attacks and ability to drive around, but unable to go on freeways." (R. 262). In February 2004 she saw an

9

accident and was able to help the victims. (R. 261). She improved with medication, and her last treatment notes in May 2005 indicate:

> The patient reports that she has been feeling more confident. She has been feeling less sad and less worried. The patient indicates that she is finishing her school and hoping to go back to work. However, she still gets anxious when she is driving. However, the patient is working towards doing more things and working on making changes in the way she thinks. It seemed to be helpful to her and she is feeling more positive all around.

(R. 239).

### 4. *Vocational Evidence*

Christian Barrett, a vocational expert [VE], testified at the hearing. (R. 290-93). The VE testified that Plaintiff is a younger person with high school plus four years of college (R. 291). He stated that her past relevant work was as follows: admission counsel, semi-skilled and sedentary; computer data entry clerk, semi-skilled and sedentary; cash room clerk, semi-skilled and sedentary; cashier, unskilled and light; and advertising manager, skilled and light. The VE testified that she has transferable skills to semi-skilled clerical occupations.

The ALJ asked the VE to assume an individual with Plaintiff's age, education, and work experience, and

> that such a person has no exertional limitation of lifting established. We imposed limitations of jobs that would provide for routine production and stress, simple job assignments, occasional contact with public and coworkers, and because of this if we put the individual at the unskilled level, could such a person be expected to perform Claimant's past relevant work?

(R. 291.) The VE testified that such an individual would not be capable of Plaintiff's past relevant work because "[t]he previous work activity is more complex and required more interaction with the public." The ALJ asked if there was other work "such an individual could perform" [referring to simple, unskilled jobs with only occasional contact with the public or co-

10

workers]. The VE testified that the following existed: "[i]n a skilled [sic] level service occupations such as badge checker, gate tender, information clerk, security monitor, and a full range of bench-type operations involving packaging, sorting, inspection, and assembly." (R. 292.) The VE testified that "[t]he service occupations would be about 7,000 in the metropolitan area and 13,000 in the state. Bench-type occupations, about 5,000 metropolitan area, about 9,000 in the state." He stated that all would be sedentary.

The ALJ asked whether finding Plaintiff's "testimony to be credible and the non-exertional impairments described are supported by the medical evidence" whether any jobs existed for such a claimant. The VE stated that there would be no work for such a person due to the "apparent acute psychological reactions to her accident." The ALJ asked the VE to pinpoint a time relating to her psychological reactions and the VE responded, "apparently from the time of the accident until, if I'm hearing correctly, a couple months ago. I believe she said a few months ago that she's able to move more freely about the community and drive." (R. 293.)

### 5. *The ALJ's Decision*

ALJ Perez found that Plaintiff met the disability insured requirements of the Act through the date of the decision and that she had not engaged in substantial gainful activity since the alleged date of disability onset in November 2002 (R. 26).

The ALJ found that the medical evidence indicates that the claimant was involved in a motor vehicle accident on November 18, 2002 and "was diagnosed with rib fractures, pelvic ring fractures, a scalp laceration, a liver laceration and a splenic contusion [as well as] a concussion and decreased memory and vertigo with post-traumatic amnesia." (R. 26-27.) The severity of the claimant's conditions did not meet or equal the requirements of any impairment listed in

Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing") (R. 29).

ALJ Perez found that Plaintiff's allegations regarding her limitations were not fully credible (R. 29-30). Plaintiff has the residual functional capacity (RFC) "to perform work activity at any level of exertion from sedentary to very heavy including doing simple jobs involving only routine production and stress levels, and having occasional contact with the general public and coworkers." (R. 31). Given, her age, education, work experience, and her RFC, Plaintiff was "not disabled" pursuant to Medical-Vocational Rule 202.17 (R. 33-34).

## II. ANALYSIS

### A. Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.[1] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. **Factual Analysis**

In her motion Plaintiff argues the ALJ failed to properly assess the opinions of her treating psychiatrist, the consultative psychologist, and the state agency specialists, and failed to properly assess her emotional limitations and abilities. Further, she alleges that the ALJ failed to pose appropriate hypothetical questions to the VE. Lastly, she asserts that the record does not support a finding that she is able to perform semi-skilled work.[2]

Specifically, Plaintiff argues that the ALJ improperly discounted Dr. Ancell, Dr. Bayer, and the state agency professionals' opinions. It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

[2] Plaintiff also mentions that the ALJ's credibility finding was unsupported by substantial evidence (Dkt. #6, page 4). Yet, Plaintiff does not present any argument relating to this claim. Issues that are adverted to in a perfunctory manner without some effort at developed argumentation are generally deemed waived. *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir.2002).

13

Security Administration as a matter of law.[3] The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) *See also*, S.S.R. 96-2p.

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2). Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity, or a general and conclusory statement of disability or inability to work.

Under 20 C.F.R. § 404.1513 (b)(6) a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" falls within the Commissioner's definition of "medical

---

[3]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

opinion" under §404.1527(a)(2), because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)."  The same logic seems to apply for the inverse, i.e., for what a claimant cannot do in light of the impairment.

As to Dr. Ancell, Plaintiff alleges that the ALJ discounted the opinion, because it was performed at the request of her attorney.  Plaintiff's assertion (that the purpose for which a report is prepared is not a basis for rejecting it) need not be discussed here.  The ALJ stated that Dr. Ancell's opinion was being rejected because is was "not accompanied by objective medical findings or a clear medical rationale, and [was] inconsistent with other evidence of record." (R. 31).  Plaintiff argues that psychiatric evaluations were not based on objective medical evidence and were based on Dr. Blase's test results.  The ALJ acknowledged that the opinion was based on Dr. Blase's findings.  The ALJ found that Dr. Ancell had simply reiterated previous findings and thus his opinion was not entitled to significant weight.  There is no error in this.

As to Dr. Bayer, the ALJ gave reduced weight to his opinion because

> [h]e did no testing of the Claimant but only spoke with her in his office and took a history with regard to her injuries, treatment and problems, both physical and psychological.  He had one opportunity to see her, and concluded on that one visit that she had very severe mental problems to the extent that she had some impairment in reality testing or communication, which has not been shown by the objective evidence presented herein.  As previously shown she is able to run errands, drive, take her children wherever they need to go, and can communicate with others without significant difficulty, contrary to what the doctor claims.  His conclusions are in conflict with Claimant's longitudinal record.

(R. 31).  While it is noted that the record indicates that Dr. Bayer saw Plaintiff at least twice, on July 24, 2004 (R. 230-33), and October 5, 2004 (R. 229), and while the second treatment note indicates that Plaintiff was under his care, this alone does not overcome the ALJ's basis for

15

discounting the opinion, considering the record as a whole and in light of Dr. Bayer's limited contact with Plaintiff. Further, although Dr. Bayer states that Plaintiff is under his care, the record does not substantiate ongoing treatment. Thus, the ALJ gave sufficient reasons for denying controlling weight to Dr. Bayer's opinion.

As to the state agency's opinion, the ALJ stated,

> [n]either of the States Agency professionals had the opportunity to see or interview the Claimant nor did they see or hear her testify at the hearing. They only reviewed her medical evidence available through most of 2003 and did not have the opportunity to follow her progress after that time, which was only nine months to one year following the motor vehicle accident in November 2002.

(R. 31.) The ALJ gave adequate reasons for rejecting the opinions of the State Agency professionals in light of subsequent improvement. Moreover, Plaintiff lacks any argument as to why the reasoning is improper, other than rejecting a portion of the findings cited above.

Next, Plaintiff argues that the RFC is difficult to understand and determine. First, she argues that it is unclear whether the ALJ thought she could perform unskilled work or had transferable skills to semi-skilled work. Yet, the ALJ stated twice in his decision that Plaintiff was limited to unskilled work (R.33, 34). The ALJ found Plaintiff to have an RFC "to perform work activity at any level of exertion from sedentary to very heavy including doing simple jobs involving only routine production and stress levels, and having occasional contact with the general public and coworkers." (R. 31). The ALJ stated this RFC to the VE in his hypothetical (R. 291).

In response to the hypothetical the VE stated Plaintiff was capable of the following: "[i]n a skilled [sic] level service occupations such as badge checker, gate tender, information clerk, security monitor, and a full range of bench-type operations involving packaging, sorting,

16

inspection, and assembly." (R. 292). It appears that "[i]n a skilled level service occupations" is a typographical or other error in the transcript, because the jobs listed are actually unskilled jobs listed in response to the ALJ's request for a list of unskilled jobs (R. 291-92). Therefore, there is no error.

Lastly, Plaintiff argues that she cannot perform semi-skilled occupations with the limitations described in the mental assessment, which were not part of the hypothetical. Specifically, Plaintiff argues that the ALJ did not include the following in his hypothetical to the VE: moderate limitations in the following: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others (R. 113-14). These limitations were part of the psychiatric review technique form that the ALJ found was "not entirely consistent with the Claimant's longitudinal record" (R. 31). The State Agency psychiatrist, Dr. Joseph, found Plaintiff capable of performing simple, repetitive tasks on a continuing basis, notwithstanding these limitations (R. 115). Also, the ALJ gave a sufficient explanation for discounting the State Agency professional's opinion in this case in light of more recent evidence. *Supra,* page 16. Finally, while the VE referred to semi-skilled jobs (R. 291), the ALJ limited Plaintiff to unskilled jobs (R. 291). Thus, there is no demonstrated error warranting a

modification of the ALJ's findings.

## III. RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

**Note:** any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


Dated: July 2, 2007　　　　　　　　　　　　s/ Steven D. Pepe
Flint, Michigan　　　　　　　　　　　　　　United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on <u>July 2, 2007,</u> I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James A. Brunson and Kenneth F. Laritz</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Social Security Administration- Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, Il 60606</u>.

<u>s/James P. Peltier</u>
U.S. District Court
600 Church St
Flint, MI 48502
810-341-7850
pete_peltier@mied.uscourts.gov